Good morning, Your Honors. My name is Susan Hill and I represent the petitioner, Mr. Tamim. And at this time, I'd like to introduce you to the debate time. Mr. Tamim is an Algerian who was denied asylum, withholding, and relief under the Convention Against Torture. The denial was improper because he was persecuted in Algeria on account of his neutral political opinion, and he also had a likelihood of future persecution for the same reason. And he also would be tortured if he did return to Algeria. How was he persecuted? He was persecuted in the past. It was based on about four events that happened to him. First, his brother, who was known to be, I think it was stated in both his asylum declaration and testimony, that his brother was known to be, quote, against the generals in Algeria who were running Algeria. The brother disappeared, and then later on they found out through basically a fortuitous circumstance that their brother had been killed by the Algerian government. Right, so his brother was killed. Correct. What personal—I mean, not that that's not a tragic family situation, but what— because you talked about his neutrality. What was—is that really the issue as to whether he was simply, as he put it, trying to— the rebels or the—I forget what he called them—and the government. But what did he do that drew persecution directly as to him? Well, first of all, because he was related to his brother, that's—and if I may back up for just a second, there was no other reason for his brother to be killed by the government. Again, they had the evidence that he was known to be against the generals, but there was no criminal investigation against the brother. So, therefore, it can be presumed that the brother was killed by the government as is suspected. But even if that was so, if Mr. Tanim doesn't share his brother's political views, he wants to take a neutral position, how can he derivatively claim persecution through the death of his brother? As I was going to say, the government suspected the brother of being a terrorist sympathizer. Therefore, because the brother was related—he was related to his brother— So it's solely by virtue of his blood relationship that you claim he's entitled to claim what? It can't be imputed political opinion because he doesn't share his brother's political opinion. Right. And there were also other facts in existence as well. It all combined to show that he could be imputed an adverse opinion to the government. Okay. Why don't you—you said there were four factors. Why don't you move on to the other three? Okay. There was the brother, then he was a university student, and that the fundamentalist terrorists had declared that universities were contrary to their agenda and that anyone who supported the universities were therefore imputed an adverse opinion to the terrorists. I'm sorry to be a little confusing at this point. Well, it's kind of an odd argument. It's a claim that because the terrorists don't believe in university education, that because he's a university student— I have one more step. Okay. I'm eagerly awaiting it. It is a little convoluted, but the situation in Algeria is rather convoluted. He was a university student. However, he was caught in the middle, and he did not know what to do. If he withdrew from the university, then the government would assume he withdrew because he was supporting the terrorists. If he remained in the university, then the terrorists would assume he was supporting the government. And that's the third reason. Furthermore, when he did withdraw from the university and he left Algeria, the government went after him. They questioned his mother as to his whereabouts. And when the mother said he had left Algeria, that was not good enough for the government. She had to bring witnesses to the police station to prove that he had left. So if the government were not suspecting him of being a terrorist sympathizer, I don't see a reason why he would have to prove that he left the country. If he withdrew from the university and remained in the country, obviously they assumed that he was supporting the terrorists. Now, he also injected, though, the army factor. So where does that fit in? Because the army factor, at the end of the I.J.'s question, he says, is there anything else? And he brings up the army. And he said, my mother didn't want me to go into the army because if I went into the army, there would be killing. And then the I.J. clarifies killing in what sense. And he says, I could be killed in this civil war. So just to distill it all down, and you've done a good job of summarizing it, though, but the picture that emerges is a fellow who was trying in this very difficult political situation to stay below the radar. And he's caught between a rock and a hard place, as it may be put. How does that differentiate him from anybody else who is in Algeria and leaves? It sounds like he is caught in this terrible situation, and then he's confronted with army service, and we get these cases of army deserters who come before us. Where is it that is brought to him as someone who is particularly himself being persecuted for his political views? He differs from most people in Algeria in that he was a university student who dropped out of the university, and therefore he was imputed with the anti-government opinion. Combined with the fact that he then did not show up for the supposed – if he dropped out of university, it appears that he was expected to then serve in the army, and he did not show up to serve in the army. Therefore, again, he was imputed an anti-government opinion. Plus, with his brother and the family relations that the government is very readily – they very readily attribute to other family members, other members' political opinions. And then finally, they did go searching for him. So he does differ from anyone else in Algeria who is trying to, quote, stay below the radar. Moreover, he consciously made the decision. He did not want to be involved in either faction. And the judge did sort of distill it down at the very end. With all due respect to that judge, I know that the Ninth Circuit has had some problems with him in the past for sort of leading people through the hearings in a bit of a shortened fashion. If you refer back to Mr. Tamim's asylum declaration and his notice of appeal, he more succinctly stated his reasons for not wanting to serve. His notice of appeal certainly did that. Yes. There he injected the war crimes issue. Correct. And his declaration also, he was afraid. He did not want to – I think he said he did not want to shoot other citizens of his country. He did not want to be recruited to fight against his fellow brothers. So he did have his reasons for not wanting to serve in the Algerian military. You know, I take your point for I don't know what way we give it about maybe the I.J. led him through the questioning, but the army issue was brought up by Mr. Tamim. His attorney did not raise it. Right. And so to suggest it's the I.J.'s fault for leading him, the attorney didn't, A, bring it up and certainly didn't take the opportunity to clarify because the I.J. clearly established it was his fear of his own death as opposed to the more well-articulated statement in the BIA appeal, and that's troublesome. Correct. And I don't intend to make it sound like it is the judge's fault. I just mean that in testimony, the purpose of the testimony is not necessarily to – it does not have to be as detailed as what the declarations have already set forth. He did have a fairly detailed declaration explaining his reasons. The judge then summarized the essence of what he had already stated in his asylum declaration, and the judge did so in a fairly undetailed manner that did not elicit all the reasons that he had for not wanting to join the military. And for that reason, I would ask that the Court not focus on solely what he said in response to the judge's somewhat leading question that did summarize. Okay. Do you want to save the rest of your time? Please. Thank you. All right. Thank you. Good morning, Your Honor. Nora Ascoli Schwarz for Respondent John Ashcroft. Nothing ever happened to Petitioner when he was in Algeria. Anything that may happen to him is purely speculation as what he thinks may happen to him. Although he does have a pretty powerful concern, since it's his brother who was killed. Your Honor, I dispute that. We have two explanations. What happened to his brother is purely speculation also. Did I.J. assume that the brother wasn't killed? Based on his testimony, we can't presume that as a fact. He believed that Mr. Timmon believes his brother was killed. Well, what do we do with that? I mean, if his brother was killed, isn't that a pretty powerful cause for being fearful for your own life? No, Your Honor, because first of all, he thought his brother had gone to Libya. Yeah. And I refer the court to. Right. He thought he was, and then he was told that, in fact, he'd been killed. And he. I refer the court to pages 182, which is his declaration in which he says that armed militants came to my house and told my mother that my brother had been killed. In his testimony, he says a policeman who was a friend of the family, and this is at page 94, happened to mention to my cousin who told my mother. So, I mean, there's a big difference as to how he found out. I'm not saying it's not credible, but in view of the circumstances. Well, it's not a question whether you're saying it's credible. What did the I.J. make? The immigration judge, there's no absolute finding that his brother was killed. There certainly is not.  No. Again, this goes to the subjective basis. Mr. Temin may have believed that his brother was killed, but his evidence on this is inconsistent, and there is no absolute knowledge that he was killed. What's the inconsistency? The fact that. How he learned about it? The fact that he. Yes, how he learned about it. Because. That's pretty minor, I would think. Not really, Your Honor, because it's a major difference. He says he was at home when the army came and said to his mother, your brother, your son was killed. He was at home at the time the army came and said to his mother, we've killed your son. In testimony, he says, a friend of ours who was a policeman happened to mention to my cousin that my brother was killed. Until then, they thought he was happy in Libya. So the reason it's significant is because in one case you have an official visit by the government to the house. Wait a minute. I'm looking at his declaration. It says in summer 1995, the security reached our house to inform my mother that my brother was killed. He was accompanied by armed group. We were not informed about more details or where my brother, where was my brother's grave. It doesn't say anything. He was there. I just said. Okay. But still, there's a big difference between the security forces coming to the house and saying your son is killed and then saying, well, a cousin on my father's side was told by a friend of ours. And that's a friendly way of saying, oh, listen, you need to know what happened to your cousin's mother's son. And the military coming and saying, we've killed him. So that is material. But the point is, it doesn't affect this case in any event because there was no political opinion imputed to this Petitioner. He was caught between a rock and a hard place, as is everyone in Algeria. Wait a minute. I just want to. You're making a. I'm sorry. There's no finding, and I'm just looking at the testimony. And 94. Yes. Do you know who killed your brother? My brother that year said to my mother that he was going to work in Libya. That year they informed us, though not officially, but the police came, the police whom we knew. They came and said my brother was killed by the Algerian government. And that's what the Algerian police told you, not officially, but some policemen whom we knew in the city. And then it goes on to say they didn't speak to me personally. They spoke with my cousin, paternal cousin, as opposed to the military coming and telling my mother. There is a significant difference there. Well, did the IJ focus on that? The immigration judge was troubled with the fact that there was no ethic, no proof. He didn't focus on the specific difference, but that there was no proof that the brother had even been killed. And, in fact, there still isn't. As far as he knows, he's still in Libya. People may have gone and thought that he was killed and he's living safely in the United States. But that's not the crux of it. The crux of it is this is clearly an Elias Zacharias, Martinez Romero, Ndom case. He is caught in the middle. He does not have a political opinion. He just doesn't want to serve on either side. He doesn't want to be killed. He doesn't want to kill. That's understandable. That's conscientious objector. But it doesn't entitle you to asylum because nobody is imputing a political opinion to him. If the military went to his house to look for him, he's avoided compulsory military service. He has to serve a year of compulsory service. He has not been there to serve it. If they went to his house, they may have just been looking for him to say it's your time to serve your country. And there's no evidence to the contrary, and it is his burden to establish evidence which compels the conclusion that it was for a persecutory motive. There is no evidence that anyone has imputed any motive to him. He has come to no harm. Any harm, he fears, is entirely speculative. And I would also direct this Court's attention to the page, let's see, 162 to 163, where it says internal relocation is possible. And, in fact, they mention on page 163 his hometown as one of the safest places in Algeria to live, where these terrorist incidents do not occur. So what he's saying is I left the university because people were bombing the university. That's not persecution directed toward him. It was a political statement, and he happens to be a university student, so he feels he will be harmed by random terrorist acts which may be directed against the university. But then that would entitle every university student to asylum. And that's not what the law allows. And the same thing with not wanting to join the military. I can understand that he doesn't want to kill his countrymen. However, that doesn't mean that he is being asked to serve on account of his opposition. Every male in Algeria is required to serve in the military. So being a university student, he says he doesn't know what happened to his brother. There is no political opinion which may have been imputed to his brother if his brother indeed was killed that would have been imputed to him. There's no nexus to a statutorily protected ground. So it is governed entirely by Elias Zacharias Vidal, which also said no past persecution, which is based on the finding in Martinez-Romero. Evidence of general civil strife in a country does not entitle all the nationals of that country to asylum. There has to be a specific reason why this individual would be targeted, and there is none in this case. Thank you, Your Honors. Your Honors, with regard to how he found out about the brother, I would say that that's a detail that does not matter, especially when the judge specifically found Mr. Tameem to be credible, and therefore the fact that his brother was killed was taken for its face value. Furthermore, Mr. Tameem is different than anyone else in Algeria who was a student. He was sought after by the government, and once they determined that he had left the country, they told his mother he's safer there. That's an extra detail that other people don't have. I would argue that it can be attributed that he's in some kind of trouble with the government and he had better not come back. Furthermore, in his brief, he did set out that people who have deserted the army do face a disproportionate punishment for their desertion, and that is a grounds for asylum. I may have missed a time element there, but he went to Tunis and then he went to Syria. Now, the government wasn't following him or harassing him or anything then, were they? At what point? At the time when he went to Syria and came back and went to Tunis and came back. He wasn't being singled out for any special attention by the government then, was he? Not at that point. After he left, and I believe it was when he was in Syria, was when the police came looking for him, and that's when it started. He had a passport, didn't he? I believe, yes, he did. And so they hadn't told him he couldn't leave or not to leave the country or anything? But that does not necessarily mean that he would not be subject to persecution if he returned, especially in light of the fact of the events that happened after his departure. Okay. Thank you very much. Counsel, we thank you both for the argument, and the case just argued is submitted. And we do really appreciate the good arguments in these cases, believe me. On both sides. On both sides, absolutely. All right, the next case on calendar is Janazian v. Ashcroft, submitted on the briefs. So we'll move then to Alamayu v. Ashcroft.
judges: Goodwin, Fisher, Tallman